FILED BY [handwritten initials] D.C.
AUG 25 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

STEVEN E. GREER
a Port St. Lucie resident

Plaintiff,

v.

CITY OF PORT ST. LUCIE, FLORIDA,
a Florida Municipal Corporation,

SHANNON MARTIN,
in her official capacity as Mayor of the City of Port St. Lucie and in her individual capacity,

FLOCK SAFETY, INC., a Delaware corporation,

Defendants,

Case No.:

Judge:

**COMPLAINT for:**

1- VIOLATION OF THE FOURTH AMENDMENT (Warrantless Search)

2- VIOLATION OF THE FOURTH AMENDMENT (Monell Liability for National Data-Export Custom)

3- VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT under (18 U.S.C. §§ 2721–2725)

4- VIOLATION OF THE SECOND AMENDMENT (Chilling Gun Rights)

5- VIOLATION OF THE FLORIDA PUBLIC RECORDS ACT

6- VIOLATION OF ARTICLE I, SECTION 12 OF THE FLORIDA CONSTITUTION (Warrantless Search via Automated Surveillance Network)

7- VIOLATION OF ARTICLE I, SECTION 23 OF THE FLORIDA CONSTITUTION (Unlawful Government Intrusion into the Right of Privacy)

8- VIOLATION OF ARTICLE I, SECTION 9 OF THE FLORIDA CONSTITUTION (Deprivation of Due Process via Automated Shifting of Suspicion)

9- ILLEGAL EXPENDITURE OF PUBLIC FUNDS IN VIOLATION OF THE FLORIDA CONSTITUTION (Taxpayer Standing Claim)

(Jury Trial Demanded)

# Contents


RIGHT TO SUE PRO SE .......... 1
PRELIMINARY STATEMENT .......... 1
JURISDICTION AND VENUE .......... 3
PARTIES .......... 3
FACTUAL ALLEGATIONS .......... 5
The Flock ALPR Network .......... 5
- Flock has a High Error Rate Resulting in False Arrests .......... 6
- Flock in The City of Port St. Lucie .......... 7

Pedestrian Tracking, Facial Recognition, and Surveillance .......... 7
Flock Cameras Pointed at Gun Ranges .......... 9
Systemic Abuse: Police Officers Arrested .......... 11
- Georgia Bureau of Investigation arrest of Officer Tracey Royston: .......... 11
- Menasha, Wisconsin Officer Cristian Morales: .......... 12
- Sedgwick, Kansas Police Chief Lee Nygaard: .......... 12
- Braselton, Georgia Police Chief Michael Steffman: .......... 12
- Sarasota Police Officer, Cory Waiters: .......... 12
- Orange City, Florida Officer Jarmarus Brown: .......... 13
- Savannah Police Department Mass Terminations: .......... 13
- Augusta Georgia Terminations: .......... 13
- Fayetteville Police Department Terminations: .......... 13
- Mauldin, South Carolina Officer Ellie Hammond: .......... 14
- New Bedford, Massachusetts Officer Emily Pacheco: .......... 14
- Stow, Massachusetts Abuse and System Removal: .......... 14
- Lufkin, Texas Officer Zachary Anthony Klein and Network Disablement: .......... 15

Florida Police Flock Abuse .......... 15
- Pinellas County Sheriff Stalking Murder/Suicide: .......... 15
- Monroe County Sheriff's Deputy Lamar Roman: .......... 16
- Florida Highway Patrol / Lindsey Isaacs Case Study: .......... 16
- The Port St. Lucie Police Lieutenant Aaron Martin Scandal: .......... 17
- These Cases are Not Isolated: .......... 20

Police Are Intentionally Not Auditing Their Use of Flock .......... 20
Plaintiff's Concrete Injury .......... 21
Obstruction of Public Records .......... 21
Local Governments and Flock .......... 22
IRREPARABLE HARM .......... 24
The Founders Rejected Trading Liberty for Security .......... 26
BALANCE OF THE EQUITIES AND PUBLIC INTEREST .......... 28
- The Atlanta Flock Experiment .......... 29

CONCLUSION .......... 30

COUNT 1 – VIOLATION OF THE FOURTH AMENDMENT ..... 32
Statute of Limitations: ..... 32
Elements to be Proved: ..... 32
How the Facts Prove Each Element: ..... 32
COUNT 2 – VIOLATION OF THE FOURTH AMENDMENT ..... 34
Statute of Limitations: ..... 34
Elements to be Proved: ..... 34
How the Facts Prove Each Element: ..... 35
COUNT 3 – VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT (18 U.S.C. §§ 2721–2725) ..... 36
Statute of Limitations ..... 36
Elements to be Proved ..... 36
How the Facts Prove Each Element ..... 36
COUNT 4 – VIOLATION OF THE SECOND AMENDMENT ..... 37
Statute of Limitations: ..... 37
Elements to be Proved: ..... 37
How the Facts Prove Each Element: ..... 37
COUNT 5 – VIOLATION OF THE FLORIDA PUBLIC RECORDS ACT (Fla. Stat. §§ 119.01, 119.07) ..... 39
Statute of Limitations: ..... 39
Element to be Proved: ..... 39
How the Facts Prove Each Element: ..... 39
COUNT 6 – VIOLATION OF ARTICLE I, SECTION 12 OF THE FLORIDA CONSTITUTION ..... 40
Statute of Limitations: ..... 40
Elements to be Proved: ..... 40
How the Facts Prove Each Element: ..... 40
COUNT 7 – VIOLATION OF ARTICLE I, SECTION 23 OF THE FLORIDA CONSTITUTION ..... 43
Statute of Limitations: ..... 43
Elements to be Proved: ..... 43
How the Facts Prove Each Element: ..... 43
COUNT 8 – VIOLATION OF ARTICLE I, SECTION 9 OF THE FLORIDA CONSTITUTION ..... 46
Statute of Limitations: ..... 46
Elements to be Proved: ..... 46
How the Facts Prove Each Element: ..... 46
COUNT 9 – ILLEGAL EXPENDITURE OF PUBLIC FUNDS IN VIOLATION OF THE FLORIDA CONSTITUTION ..... 48
Statute of Limitations: ..... 48

Elements to be Proved: ........................................ 48
How the Facts Prove Each Element: ........................................ 48
PRAYER FOR RELIEF ........................................ 51
JURY DEMAND ........................................ 52

## RIGHT TO SUE PRO SE

1. Plaintiff Steven E. Greer, M.D., proceeds pro se pursuant to 28 U.S.C. § 1654, which allows parties to "plead and conduct their own cases personally or by counsel."

2. The Judiciary Act of 1789 first recognized the right of parties to appear pro se in federal court.

3. Many state supreme courts have studied pro se litigation and concluded that it promotes access to justice, efficiency in certain cases, and public confidence in the courts when litigants are prepared.

4. Pro se pleadings are held to less stringent standards than those drafted by lawyers (Haines v. Kerner, 404 U.S. 519 (1972)).

5. This Complaint is filed in good faith based on Plaintiff's direct observations, documentation, public records, scientific literature, news reports, and exhibits.

6. Plaintiff reserves the right to amend the Complaint as discovery proceeds or additional evidence becomes available.

## PRELIMINARY STATEMENT

7. The City of Port St. Lucie, Florida has blanketed its public roadways with a network of at least 49 Flock Safety automatic license plate reader ("ALPR") cameras. These cameras photograph every vehicle that passes them.

8. The software is the threat, not the physical cameras. Using proprietary artificial-intelligence software, the system converts each photograph into a searchable "Vehicle Fingerprint" that records not only the license plate, but also the make, model, color, roof racks, bumper stickers, dents, and other unique identifiers.

9. The data is uploaded to a centralized, nationally accessible database and retained for at least 30 days (and longer if downloaded). Any authorized officer can query the database at will and reconstruct a detailed map of a driver's movements over weeks.

10. This is precisely the type of "too permeating police surveillance" the Fourth Amendment was adopted to prevent. Carpenter v. United States, 585 U.S. 296, 305 (2018).

11. Tracking the whole of a person's public movements over an extended period is a search. Id. at 310; Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 2 F.4th 330, 341 (4th Cir. 2021) (en banc).

12. Because the City does this without a warrant, instead letting individual officers decide for themselves when and how to access an unprecedented catalogue of every driver's movements, the searches are unreasonable.

13. The City compounds the constitutional violation by contractually granting Flock Safety a perpetual, **worldwide license to share Port St. Lucie data across its national network**. Local retention settings are thereby overridden, turning the City into a portal through which out-of-state agencies and federal bureaus can monitor Port St. Lucie residents without judicial oversight.

14. Real-world experience has already exposed the system's fatal weakness: the supposed safeguards against abuse are paper-thin. Across the country, police officers and even police chiefs have been arrested or fired after using Flock terminals to stalk ex-partners, track private citizens with no open investigation, and run hundreds of unauthorized personal queries. The same systemic defects exist in Port St. Lucie.

15. To insulate this system from democratic accountability, the City has obstructed public-records requests by demanding an extortionate $1,000 "special service

charge" for basic information about camera locations and audit logs, which is an amount that far exceeds any lawful cost under Chapter 119 of the Florida Statutes.

16. Plaintiff is an ordinary resident who drives the public streets of Port St. Lucie every day. He seeks a declaration that the City's ALPR program violates the Fourth Amendment, an injunction ending the warrantless dragnet, statutory damages under the Driver's Privacy Protection Act, and an order compelling production of the requested public records without the illegal fee.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights). Supplemental jurisdiction over the Florida public-records claim exists under 28 U.S.C. § 1367(a).

18. Venue is proper in the Fort Pierce Division of the Southern District of Florida under 28 U.S.C. § 1391(b) because the Defendant is located in St. Lucie County and a substantial part of the events giving rise to the claims occurred there.

## PARTIES

19. **Plaintiff Steven E. Greer, MD** is a citizen of Port St. Lucie, Florida, and of the Southern District of Florida.

20. Dr. Greer trained in surgery in Miami and in New York, and then became a Wall Street analyst and portfolio manager at the largest banks and hedge funds. He began litigating more than a decade ago when the State of New York retaliated against him and infringed upon his First Amendment rights.

21. Plaintiff appears in this action pro se with an extensive litigation record in the federal courts, including the Supreme Court of the United States, multiple United States

Courts of Appeals, and numerous United States District Courts. Plaintiff has prevailed in the Fifth Circuit and has successfully defeated numerous motions under Federal Rule of Civil Procedure 12 in various district courts.

22. In addition, Plaintiff currently works extensively with the United States Department of Justice in connection with federal anti-fraud enforcement efforts. As a direct result of a written proposal submitted by Plaintiff, the Department of Justice's central office in Washington, D.C., authorized United States Attorneys' Offices to hire additional attorneys for anti-fraud initiatives.

23. **Defendant City of Port St. Lucie** is a Florida municipal corporation that operates and controls the Port St. Lucie Police Department. It is a "person" under 42 U.S.C. § 1983 and a public agency subject to Chapter 119 of the Florida Statutes.

24. **Defendant Shannon Martin** is the Mayor of the City of Port St. Lucie. She is sued in her official capacity and in her individual capacity. At all relevant times she acted under color of state law.

25. **Defendant Flock Safety, Inc.** is a Delaware corporation that designed, sold, installed, and continues to operate the ALPR network used by the City. Flock acts under color of state law through its joint participation with the City in the surveillance program and through the contractual data-sharing arrangement that makes the City's data available on Flock's national platform. The registered address is c/o Registered Agent 2711 Centerville Road, Suite 400 Wilmington, New Castle County, DE 19808

# FACTUAL ALLEGATIONS

## The Flock ALPR Network

26. Flock Safety markets and sells a network of solar-powered, AI-enabled cameras that photograph every passing vehicle, extract license-plate data and vehicle characteristics through machine learning, and upload the resulting "Vehicle Fingerprint" to a centralized cloud database.

27. Under a multi-year contract running through at least November 2028, the City maintains 49 approved Flock cameras at strategic, high-traffic locations throughout Port St. Lucie. The cameras operate 24 hours a day, capture vehicles traveling at highway speeds, and achieve high accuracy even at night.

28. The system does far more than a traditional point-in-time license-plate check. It records make, model, color, roof racks, bumper stickers, unique damage, and other identifiers. Officers can generate lists of every location a particular vehicle has been seen, lists of vehicles that visited a particular location, and associations of vehicles that frequently appear together.

29. The Flock cameras are also pointed towards parks where no cars drive, as well as entrances to major shopping hubs, such as Home Depot. The Flock system does monitor faces and human bodies, despite denials.

30. Data is retained for a default period of 30 days (and longer if downloaded by an officer for an investigation). The City's contract with Flock grants Flock a non-exclusive, worldwide, perpetual, royalty-free license to share the data across its national platform. Local retention settings, therefore, do not prevent out-of-state and federal agencies from accessing Port St. Lucie records.

31. Flock data are illegally shared across state lines between police without warrant. Data from Lucas County, Ohio, illustrates this unbounded national reach of the Flock network. In a 30-day period between June and July 2026, the Houston Police Department, an agency located more than 1,200 miles away, searched Lucas County's Flock camera system more than 71,000 times, making it the single largest user of that Ohio county's data. Texas Department of Public Safety and Harris County Sheriff's Office together added more than 23,000 additional searches. In total, Houston-area agencies accounted for 16 percent of all queries on the Lucas County system during that month. Lucas County officials expressed shock at the volume and could offer no explanation for why a distant Texas police department was the dominant user of their local camera network.

32. This is the practical result of the contractual national data-sharing architecture that Port St. Lucie has joined: local residents' movements become freely searchable by agencies across the country with no meaningful local control or judicial oversight.

**Flock has a High Error Rate Resulting in False Arrests**

33. The commercial claims of system accuracy are mathematically deceptive and mask a significant real-world margin of error. As a recent video report by the Institute for Justice (IJ)[1] highlights, leading ALPR vendors aggressively market a 93% accuracy rate. In practice, however, cameras routinely misidentify character variations, such as mistaking a 2 for a 7 or a 0 for the letter O, resulting in 7 mistakes for every 100 scans.

34. When applied to an industry leader scanning 20 billion plates per month, this 7% error rate generates 1.4 billion incorrect captures every month.

---

[1] Institute for Justice, *Dozens of Innocent Motorists Have Been Pulled Over, Detained at Gunpoint, or Jailed Due to AI License Plate Camera Errors* (July 1, 2026), https://ij.org/dozens-of-innocent-motorists-have-been-pulled-over-detained-at-gunpoint-or-jailed-due-to-ai-license-plate-camera-errors/.

35. Despite these systemic legibility issues, the software automatically uploads these flawed "Vehicle Fingerprints" directly into law enforcement networks, creating an environment where automated data errors predictably trigger wrongful hot-list stops, false alerts, and dangerous police confrontations for innocent drivers.

**Flock in The City of Port St. Lucie**

36. Because the City of Port St. Lucie has refused to produce its own Flock contracts, camera costs, and related financial records in response to public-records requests, Plaintiff relies on publicly available comparable contracts from the St. Lucie County Sheriff's Office (the county in which Port St. Lucie is located) as surrogate data. Those public records show that the Sheriff's Office currently pays approximately $113,000 per year under its primary multi-year Flock agreement for a network of 44 Falcon cameras plus one Falcon Flex unit and the associated FlockOS platform. Earlier County contracts from 2021 and 2023 priced standard Falcon units at $2,500 per camera per year before consolidation and discounts. This publicly documented spending provides a reasonable baseline for the scale of the City's own 49-camera deployment and the commercial value of the data the City is continuously exporting into Flock's national network.

37. Any officer who completes a short orientation can obtain login credentials. There is no requirement of probable cause, judicial approval, or even meaningful supervisory review before an officer queries the database. The system accepts vague or facetious justifications, including the string "hehehe", as sufficient to unlock historical tracking data.

## Pedestrian Tracking, Facial Recognition, and Surveillance

38. Flock Safety's system is not limited to vehicles. The cameras are deliberately aimed at sidewalks, parks, grassy areas, store entrances, and other locations where no cars

travel. The proprietary software performs facial recognition and body matching, creating persistent biometric identifiers of pedestrians and tracking their movements over time.

39. This is a totalitarian regime's dream. It is part of the WEF's Agenda 2030 to create open-air prisons. Communist China has already implemented these dystopian measures.

40. The City of Port St. Lucie has placed Flock cameras pointing directly into public parks, at the entrances of major retail locations such as Home Depot, and in remote or low-traffic areas. These placements serve no legitimate vehicle-enforcement purpose. Their primary function is the continuous surveillance of people on foot.

41. Despite public denials, the system captures and analyzes human faces and body characteristics. It builds searchable databases of pedestrian movements in the same way it builds "Vehicle Fingerprints." This capability allows officers to reconstruct the patterns of life of individuals who never enter a car.

42. On August 19, 2026, a WIRED investigation[2] revealed that Flock Safety has developed a powerful new AI tool for police, known as OS Investigate (formerly Nightshift), that directly contradicts the company's longstanding public claim that its cameras "cannot recognize, identify, or track individuals." WIRED obtained and partially rebuilt the tool's code, confirming that it can locate potential witnesses based solely on how frequently vehicles pass through a neighborhood, surface a driver's "associates" from vehicles that travel together, search for people by race or physical description alone (for example, "male, ~6ft, black hoodie, forearm tattoo"), and flag vehicles purely by their patterns of

[2] Dhruv Mehrotra & Dell Cameron, Flock Has a Powerful New AI Tool for Police. We Got Its Code, WIRED (Aug. 19, 2026), https://www.wired.com/story/flock-safety-os-investigate/.

movement—then link those results to police case files, 911 dispatch logs, and commercial identity databases that yield names, addresses, relatives, and other personal details.

43. The reach of Flock's network is no longer limited to municipal roadways. In 2026 the National Park Service began installing Flock cameras inside national parks under the Trump administration. These cameras operate in federally managed public lands and capture not only vehicle data but also the movements of pedestrians, hikers, and visitors in areas far removed from ordinary traffic enforcement.

44. The placement of Flock hardware inside national parks confirms that the system is being deployed as a general-purpose surveillance tool rather than a narrow license-plate reader. Combined with the software's ability to perform facial and body matching, the cameras create persistent records of people moving through public lands without any individualized suspicion or warrant.

45. The combination of fixed cameras aimed at pedestrian areas, facial and body recognition, and long-term data retention creates a pervasive tracking system that goes far beyond traditional license-plate readers. It enables the City and its officers to monitor where residents walk, gather, protest, or campaign without a warrant or individualized suspicion.

## **Flock Cameras Pointed at Gun Ranges**

46. Flock Safety cameras have been deliberately positioned to monitor the entrances and parking areas of gun ranges, capturing the license plates and vehicle fingerprints of individuals exercising their Second Amendment rights. This practice creates a searchable record of lawful gun owners and range visitors without any individualized suspicion or warrant.

47. In Marion County, Florida, Daytona Beach attorney Patrick J. McGeehan documented two Flock cameras installed in the driveway entrance to the Ocala Shooting

Range, a public pistol and rifle range operated by the Florida Fish and Wildlife Conservation Commission within the Ocala National Forest. The cameras were positioned to photograph vehicles both entering and exiting the range, rather than general roadway traffic. McGeehan publicly reported the placement in August 2026 and submitted a public-records request to the FWC regarding the cameras.

48. In Cudahy, Wisconsin (Milwaukee area), multiple Flock cameras were installed at Eagle Sports Range and pointed into the entrance of the range's parking lot, capturing the license plates of vehicles arriving to use the facility. The cameras were installed in 2023 following break-ins at other local ranges. After a viral video in early August 2026 highlighted the placement and raised widespread privacy concerns, range management removed the cameras themselves, stating that customer privacy outweighed any contractual obligations with Flock.

49. In St. Lucie County, Florida, the same county in which Plaintiff resides and the City of Port St. Lucie operates its own Flock network, there are more than 40 Flock cameras deployed as a dragnet. Every major shooting range and gun club in the area sits on roads covered by these cameras, which record gun owners traveling to those locations. The Flock software and databases make it easy to flag anyone repeatedly going to a gun range.

50. The primary ranges and gun clubs within roughly 60 miles of Port St. Lucie include:

- **St. Lucie Shooting Center**, 490 NW Concourse Place, Port St. Lucie, FL 34986
- **South Florida Shooting Club**, 500 SW Long Drive, Palm City, FL 34990
- **Martin County Sportsmen's Association**, 8415 SW Busch Street, Palm City, FL 34990
- **Continental Shooting Center**, 3091 SE Jay Street, Stuart, FL 34997

- **Lotus Gunworks**, 3558 NW Federal Highway, Jensen Beach, FL 34957
- **Okeechobee Shooting Sports**, 7055 NE 48th Street, Okeechobee, FL 34972
- **OK Corral Gun Club**, 9449 NE 48th Street, Okeechobee, FL 34972
- **Vero Beach Clay Shooting Sports**, 5925 82nd Avenue, Vero Beach, FL 32967
- **Indian River County Public Shooting Range**, 10455 102nd Terrace, Sebastian, FL 32958
- **Indian River Sportsman Indoor Shooting Range**, 4185 N US Highway 1, Vero Beach, FL 32967

51. Because Flock cameras are positioned on the main roads leading to these facilities (and in many cases within a short distance of the entrances), the dragnet makes it practically impossible for a gun owner to visit any of these ranges or clubs without being recorded if law enforcement chooses to track the names of people traveling to gun ranges.

## Systemic Abuse: Police Officers Arrested

52. Flock markets its system as tightly regulated by supervisor audit logs and mandatory search justifications. Real-world deployment has proven those claims false. In 2026 alone, multiple officers and police chiefs across the country have been arrested or terminated after weaponizing Flock terminals for purely personal tracking of private citizens.

### Georgia Bureau of Investigation arrest of Officer Tracey Royston:

53. On August 7, 2026, the Georgia Bureau of Investigation arrested former Polk County Police Officer Tracey Royston, who had been assigned to a drug task force. Royston was charged with four misdemeanor counts of computer trespass and official misconduct after investigators proved she used her administrative credentials to run completely

unauthorized personal tracking queries against individuals outside any legitimate law-enforcement investigation.

**<u>Menasha, Wisconsin Officer Cristian Morales:</u>**

54. In January 2026, Menasha Police Officer Cristian Morales was arrested and criminally charged with misconduct in office. Morales systematically used his municipal Flock terminal to monitor and track his ex-girlfriend's vehicle history.

**<u>Sedgwick, Kansas Police Chief Lee Nygaard:</u>**

55. Former Sedgwick Police Chief Lee Nygaard exploited his agency's Flock system to target his ex-girlfriend. He ran her license plates 228 times over a four-month period, tracking her and his new partner before physically tailing them in his police cruiser.

**<u>Braselton, Georgia Police Chief Michael Steffman:</u>**

56. Former Braselton Police Chief Michael Steffman was arrested after a state investigation revealed he used the ALPR network to actively stalk and harass multiple private citizens against whom there were no criminal files or open cases.

**<u>Sarasota Police Officer, Cory Waiters:</u>**

57. In August of 2026, former Sarasota Police Officer Cory Waiters (age 38) was arrested, fired, and jailed after an investigation showed he ran the same Florida license plate through Flock 358 times between May and October 2025. He also made multiple unauthorized searches of the same plate in Florida's DAVID database. Investigators confirmed he was not working any legitimate criminal case involving the vehicle. The misconduct was first flagged by a reporter reviewing publicly available Flock audit logs. Waiters faces two felonies (computer offenses and official misconduct) plus a misdemeanor public-records violation.

**Orange City, Florida Officer Jarmarus Brown:**

58. Officer Jarmarus Brown of the Orange City Police Department was stripped of his authority after internal audits showed he ran his girlfriend's and his family members' plates more than 100 times over a seven-month span for personal leverage.

**Savannah Police Department Mass Terminations:**

59. In August 2026, a criminal investigation led to the immediate termination of six Savannah Police Department employees, including four sworn officers, after they manipulated system entry parameters to conduct non-permissible, unauthorized tracking queries.

**Augusta Georgia Terminations:**

60. In mid-2026, an internal audit at the Richmond County Sheriff's Office resulted in the felony arrests and terminations of four employees for personal database abuse. In June 2026, Deputy Jaquarius Yarbrough was fired and arrested after investigators discovered he searched the Flock database 1,639 times to stalk a private citizen. By July 20, 2026, the investigation expanded to ensnare Fleet Supervisor Lt. John McKenzie, Investigator Curtis Hoskins, and Deputy Joshua Johnson, each of whom conducted over 100 unauthorized personal searches. All four former officers were booked into the Charles B. Webster Detention Center on felony charges, including Violation of Oath of Office (O.C.G.A. § 16-10-1).

**Fayetteville Police Department Terminations:**

61. The Fayetteville Police Department simultaneously fired three officers after an internal review caught them executing unrecorded personal queries.

**Mauldin, South Carolina Officer Ellie Hammond:**

62. In August 2026, Mauldin Police Officer Ellie Anna Hammond, 24, was terminated after records showed she used the department's Flock system 166 times between March and July 2026 to track a former significant other's vehicle. She falsely logged the searches as warrant checks, traffic infractions, and welfare checks. No criminal charges were filed, but she was stripped of her law-enforcement certification. This was the fifth Greenville County law-enforcement employee fired for Flock misuse in roughly two months.

**New Bedford, Massachusetts Officer Emily Pacheco:**

63. In August 2026, New Bedford Police Officer Emily Pacheco was placed on administrative leave and a six-month abuse-prevention order was entered against her after her former girlfriend alleged Pacheco used the department's Flock cameras to track her vehicle following their breakup. The ex-partner testified that police notified her the plate had been searched a "concerning" number of times. Pacheco denied personal tracking and claimed any searches were tied to a legitimate investigation. The New Bedford Police Department responded by suspending its entire Flock network pending a full review.

64. This places the new national examples with the other external abuse cases, right before the local Port St. Lucie scandal begins.

**Stow, Massachusetts Abuse and System Removal:**

65. Stow Police Detective Jason Rogers conducted multiple unauthorized queries through Flock Safety cameras to track an acquaintance between 2024 and 2025. Rogers entered false search justifications without a legitimate law enforcement purpose. The department filed a criminal complaint, referred the matter to the Middlesex District Attorney, and suspended Rogers without pay pending an August 26, 2026 termination hearing. As a direct result of this misconduct, Chief Michael Sallese completely severed the

department's contract with Flock Safety and ordered the immediate physical removal of all remaining automated license-plate reader hardware.

**Lufkin, Texas Officer Zachary Anthony Klein and Network Disablement:**

66. On August 20, 2026, Texas Rangers arrested Lufkin Police Department Officer Zachary Anthony Klein (also referred to as Zach Klein), an 11-year member of the department, on two state jail felony charges (abuse of official capacity and tampering with a governmental record) stemming from an investigation into the potential misuse of the department's Flock Automated License Plate Reader system. A second Lufkin officer was placed on administrative leave pending further investigation into that officer's use of the technology.

67. In direct response, the Lufkin Police Department disabled and suspended all Flock cameras within the Lufkin area. The department stated it became aware of potential issues, began an internal audit, and Chief Travis Brazil requested an independent Texas Rangers investigation. No bond was set as of the initial reports. This is another documented instance in which officer misuse of Flock led a police department to immediately take its entire local network offline.

## Florida Police Flock Abuse

**The Pinellas County Sheriff Stalking Murder/Suicide:**

68. On August 10, 2026, Pinellas County Sheriff's Office Deputy Troy Savetz kidnapped his ex-girlfriend Mandy Fackler from her home in Hudson in front of their two young children, drove her to Spring Hill, and murdered her before killing himself. Savetz used the Flock ALPR network to locate and track Fackler's movements in the hours leading up to the kidnapping. This incident demonstrates that Flock's warrantless tracking capability

can and does enable lethal domestic violence by armed officers who have unrestricted access to the system.

**Monroe County Sheriff's Deputy Lamar Roman:**

69. In March 2026, Monroe County Sheriff's Deputy Lamar Roman was arrested after using an automated license-plate reader system to track and pursue an actress he had met while working off-duty security on the set of the Apple TV series Bad Monkey. After obtaining her personal information on set, he placed her vehicle on a hot list, received real-time alerts when it appeared on the network, sped after her at high speed (nearly causing a head-on collision), and conducted a traffic stop. The case illustrates how officers can weaponize ALPR technology for personal pursuit of private citizens with no legitimate law-enforcement purpose.

**Florida Highway Patrol / Lindsey Isaacs Case Study:**

70. The catastrophic danger of law enforcement's blind reliance on automated Flock logs is illustrated by the wrongful arrest and near-ruin of 23-year-old Lindsey Isaacs. Following an October 2025 triple-fatal hit-and-run on Interstate 4, a Flock terminal flagged Isaacs' black Dodge Durango passing a camera miles from the crash site. Troopers aggressively turned this single automated hit into the entire spine of their prosecution, seizing her completely undamaged vehicle under false pretenses. FHP investigators completely ignored a mountain of physical evidence, including a maroon paint transfer on the victims' vehicle, a partial plate mismatch, and conflicting eyewitness accounts. After Isaacs was arrested, she spent 13 harrowing days in jail facing a life sentence. Felony charges were finally dropped against her after independent reconstruction teams verified the data error and arrested the actual driver of a maroon Durango.

**The Port St. Lucie Police Lieutenant Aaron Martin Scandal:**

71. The systemic abuse of Flock is not limited to other cities. It has already occurred inside the Port St. Lucie Police Department itself, carried out by Defendant Lieutenant Aaron Martin.

72. In 2026, Steven Giordano was and still is a candidate for Mayor of Port St. Lucie running against Defendant Mayor Shannon Martin. Lieutenant Aaron Martin is the husband of Mayor Shannon Martin.

73. On August 7, 2026, at approximately 12:37 a.m., Steven Giordano filmed Port St. Lucie Lieutenant Aaron Martin stealing Giordano campaign signs at the intersection of SW Airoso Boulevard and SW Thornhill Drive.

74. The footage made it into social media posts and became a sensation. Local TV stations WFLX, CBS12, and WPBF, among others, covered the story because it was the Mayor's husband caught in the act.

75. Then, the Port St. Lucie Police Department retaliated by leaking Flock Safety footage of Giordano to the press.

76. The leaked footage was taken on August 5, 2026, and showed Giordano removing a campaign sign while on foot, at the intersection of SW Airoso Boulevard and SW Thanksgiving Avenue (the lot where the signs were located was 2022 SW Thanksgiving Avenue, and owned by Gwynne Guzzetta).

77. However, the footage was leaked and presented to the press as if it were part of an "ongoing investigation" into Giordano. That characterization is false. There was no investigation.

78. As a result, the following misleading news reports damaged Mr. Giordano's reputation with:

WFLX / WPTV: Port St. Lucie police release details on 2 separate political campaign sign investigations

• Caption/intro: "Security cameras capture suspected sign thieves (Port St. Lucie Police Department)"
• Body: "Detectives reviewed surveillance video from the area, which appears to show Giordano and the unidentified adult female arrive at the residence, approach campaign signs displayed in the yard, and interact with the signage… Detectives collected the video evidence…"

CBS12 / WPEC: F-bombs fly in clash over Port St. Lucie campaign signs

• "Investigators reviewed surveillance footage that showed Giordano and the woman approaching campaign signs displayed in the yard. PSLPD said the video then showed the woman removing a campaign sign supporting Mayor Shannon Martin…"

WPBF: Port St. Lucie police investigate campaign sign disputes involving mayoral candidates - WPBF

• "Surveillance footage shows a woman removing one of Mayor Shannon Martin's campaign signs on SW Thanksgiving Avenue on Wednesday night. Police say the footage also shows one of Martin's opponents, Steven Giordano, at the scene."

TCPalm / Treasure Coast Newspapers: Police in Florida investigate mayoral campaign sign incidents

• Uses nearly identical police-sourced language: a sergeant observed the pair, then detectives reviewed surveillance video that appears to show the interaction with the signs.

79. In fact, on August 5th, a Port St. Lucie Police Sergeant (last name of Griffin) was standing immediately next to Giordano while he removed the sign. This location is adjacent to the Port St. Lucie police station, and Giordano waved over Griffin to make sure the police did not think he was stealing the signs.

80. In fact, Mr. Giordano had permission from the property owner to remove the Mayor Martin sign, informed Officer Griffin of that, and encountered no objection or enforcement action at the time.

81. Of note, what occurred leading up to the August 5th incident was that someone from Mayor Martin's campaign first lied to Ms. Guzzetta by claiming that Giordano was a Democrat. Those Martin staffers then removed Giordano's signs. When Giordano explained that he was not a Democrat, Guzzetta allowed Giordano to remove those Mayor Martin signs.

82. Only days later, after Lieutenant Aaron Martin (the Mayor's husband) was caught on video stealing Giordano signs, did the Department seize upon the August 5th Flock footage and release it publicly in an effort to create the appearance that Giordano was equally culpable. The timing and manner of the leak demonstrate political retaliation, not legitimate law-enforcement activity.

83. This aforementioned drama is not about the legality of removing campaign signs, which are mundane occurrences. It is about the serious matter of the misuse of the Flock system by senior officers of a police department. The Port St. Lucie Police Department used Flock cameras to track an individual pedestrian (i.e., not a vehicle), obtained the resulting footage, and then selectively leaked that police-sourced Flock video to the press in order to retaliate against a political opponent of Mayor Shannon Martin. The leaked video itself proves that the City's Flock network is routinely employed to monitor and record the movements of people on foot.

84. On August 11, 2026, the Port St. Lucie Police Chief, Leo Niemczyk, placed Lieutenant Aaron Martin, Lieutenant Jason Vega, and Detective Sergeant Joseph Alves on paid administrative leave as a result of the above. The case has been officially turned over to the Florida Department of Law Enforcement (FDLE) for an independent investigation.

85. This incident demonstrates three critical facts: (a) the Flock system is used to track pedestrians, not merely vehicles; (b) the system is weaponized for political

retaliation against opponents of the Mayor; and (c) the supposed internal safeguards are meaningless when the Lieutenant connected to the system is the Mayor's own spouse.

86. The public release of Flock footage of a political rival on foot is textbook retaliation and confirms that the City's ALPR network functions as a tool of political surveillance and intimidation.

**These Cases are Not Isolated:**

87. These incidents demonstrate that Flock's "search reason" prompt is superficial and that individual officers are given the practical power to conduct prolonged, warrantless tracking of any person they choose.

## Police Are Intentionally Not Auditing Their Use of Flock

88. The Washington Post's August 19, 2026 investigation[3] found that law-enforcement agencies across the country have widely adopted Flock's automatic license-plate reader network without establishing basic procedures for monitoring its use.

89. Using publicly available search logs from the website *Have I Been Flocked*, Post reporters identified suspicious patterns of officer queries that departments themselves had overlooked. The newspaper documented at least 69 police officials who have been accused, charged with, or convicted of misusing Flock or similar systems, and noted that in at least 15 of those cases the potential misconduct was first flagged by outsiders, victims, activists, or journalists, rather than by internal audits.

90. When the Post contacted three departments about officers whose search histories showed repeated tracking of personal acquaintances, all three acknowledged they had not been conducting regular audits of the system.

---

[3] Douglas MacMillan, Aaron Schaffer & Drew Harwell, Police Departments Weren't Looking for Officers Abusing Flock. We Did It for Them., Wash. Post (Aug. 19, 2026).

91. In Florida specifically, the Post reported that Haines City authorities conducted no audits of Flock usage during the nearly two-year period in which one officer repeatedly searched his wife's license plate. After the newspaper's inquiries, the officer was arrested and charged with felonies related to computer abuse and falsifying official records.

## Plaintiff's Concrete Injury

92. Plaintiff regularly drives the public streets of Port St. Lucie. Given the placement and density of the 49 cameras, it is functionally impossible for him to travel any meaningful distance without being photographed multiple times.

93. The system has therefore catalogued his movements over multi-week periods, enabling reconstruction of his patterns of life (visits to medical providers, places of worship, political gatherings, and other private destinations) without a warrant or individualized suspicion.

## Obstruction of Public Records

94. In June 2026, a Port St. Lucie resident named Hannah Gilando submitted a written public-records request under Fla. Stat. § 119.07(1) seeking the locations of all Flock cameras and the system's audit logs.

95. The City refused to produce the records unless she paid a $1,000 "special service charge." That fee far exceeds any actual cost of duplication or extensive use of information-technology resources authorized by § 119.07(4)(d) and functions as an unlawful barrier to transparency.

96. On August 3, 2026, another member of the public (Trisha Drouillard) submitted a public-records request seeking "an active camera inventory and locations" and "a complete list of the flock cameras locations installation details and active system ids." On August 10, 2026, the City of Port St. Lucie formally denied the request in its entirety,

claiming the records are exempt from disclosure under Fla. Stat. § 119.071(2)(d) as "information revealing surveillance techniques or procedures" and/or a "comprehensive inventory of state and local law enforcement resources."

97. The City's assertion of this exemption is baseless. Camera locations on public roadways are not confidential surveillance techniques, and the statute does not authorize a blanket refusal to disclose the physical placement of fixed ALPR cameras. This outright denial is further evidence of the City's systematic effort to conceal basic information about its Flock network from public scrutiny.

## Local Governments and Flock

98. Local governments are already beginning to pull back from Flock for the reasons stated above.

99. Multiple local governments across the country have suspended, canceled, or declined to renew Flock contracts. In Arizona, Flagstaff ended its program. In California, Los Angeles (LAPD), Mountain View, Santa Cruz, and El Cerrito have ended or suspended their use of Flock. In Colorado, Fort Collins terminated its agreement. In Florida, Palm Bay recently suspended its system. In Illinois, Evanston terminated its contract. In Indiana, Bloomington and Monroe County canceled contracts. In Massachusetts, Cambridge, Framingham, and Salem ended their contracts. In Minnesota, Duluth and West St. Paul have moved to end their use of Flock cameras. In New York, Syracuse removed all of its Flock cameras in July 2026 after the Common Council revoked the contract over privacy and data-sharing concerns. In Ohio, Dayton covered and disabled its cameras, as did the counties of Knox, Butler, and Coshocton. In Oregon, Eugene and Woodburn terminated their programs. In Texas, the City of Lufkin removed Flock after a police officer was arrested. In Washington, Olympia suspended its system. In Wisconsin, Appleton canceled its agreement.

100. On August 7, 2026, the City of **Palm Bay, Florida**, near Orlando, ordered the immediate suspension of its entire Flock automated license-plate-reader system after a preliminary review determined that the cameras may not have been properly permitted or installed by Flock Safety. The system was taken offline, the physical cameras were hooded as a visible signal that they were deactivated, and the City Manager and Police Chief directed that the network remain suspended pending a full audit of permitting and installation. The City stated that the action was taken in the interest of transparency and accountability.

101. In July 2026, the Los Angeles Police Department suspended its use of Flock Safety cameras and allowed its three-year contract to expire, citing unresolved concerns over data ownership, privacy, security, and how the information is shared with other agencies. The department stated it would not resume use of the system until clearer contractual protections were in place.

102. In August of 2026, the City of **North Tonawanda, New York**, voted to remove its only remaining Flock camera (installed and operated by the Niagara County Sheriff's Office on Niagara Falls Boulevard) and to pause any further Flock installations for the foreseeable future. Mayor Austin Tylec, with council support, cited the need to "take a pause" and re-examine the power and implications of the technology amid resident privacy concerns.

103. On August 19, 2026, **Asheville, North Carolina** Mayor Esther Manheimer publicly called for the City of Asheville to terminate its Flock Safety contract and remove all of the city's Flock cameras, stating that she had "heard clearly from Asheville residents" and that a mere moratorium would be insufficient because the contract does not permit removal of the equipment without full termination. She scheduled a City Council vote for

August 25, 2026, and also requested a transparent policy for handling and deleting any data already collected.

104. Following strong resident opposition expressed at a packed August 17–18, 2026 council meeting, **Fort Mitchell, Kentucky** Mayor Greg Pohlgeers announced that the city would immediately shut down and remove its five Flock cameras and would not renew its contract with the company. The mayor stated that the decision was made after carefully considering community concerns about privacy, transparency, and public trust, and that the city would "be just fine without it."

105. On August 19, 2026, the **Oxford, Ohio** City Council voted 6-1 to end the city's Flock/ALPR contract, reversing course after months of public concern over privacy, data-sharing, and surveillance. The vote came after the Police and Community Relations Review Commission had earlier declined to recommend termination and instead forwarded reform proposals, but the full council ultimately chose to terminate the agreement.

## **IRREPARABLE HARM**

106. The harm inflicted by the Defendants' Flock network is irreparable.

107. Every day that the system continues to operate, it captures and uploads to a centralized cloud database the license-plate data, vehicle fingerprints, travel patterns, and movements of Port St. Lucie residents. It also captures and analyzes the faces and body characteristics of pedestrians, including children playing in public parks and playgrounds.

108. That data is not confined to Port St. Lucie or even Florida. By contractual design, it is shared across Flock's national and worldwide network. Once uploaded, the information leaves the control of the City and becomes accessible to unknown agencies, entities, and individuals far outside the boundaries of the municipality that signed the contract.

109. This is a genie let out of the bottle. Once the data has been exported into Flock's cloud and national platform, it cannot be recalled. The invasion of privacy cannot be undone by later monetary damages or a court order issued months or years from now.

110. The danger is not abstract and is not limited to theoretical privacy violations or even ordinary police harassment. Armed officers with unrestricted access to this system can and do use it to locate, track, and kill.

111. On August 10, 2026, Pinellas County Deputy Troy Savetz used Flock's tracking capability to find his ex-girlfriend, kidnap her in front of their children, and murder her before taking his own life.

112. When an officer decides to weaponize the network for personal violence, the result can be irreversible death.

113. Any witness, whistleblower, political opponent, or ordinary resident who dares speak out against police misconduct now has every reason to fear that the same system will be used to locate them and that the next step could be murder. The chilling effect is immediate and severe. People will remain silent rather than risk being tracked and killed.

114. Secret or unaccountable actors, whether domestic or foreign, who obtain access to this database can use the information to track, harass, intimidate, or harm residents, including children. The risk is not theoretical. It is inherent in a system that systematically collects and globally disseminates biometric and location data without individualized suspicion or judicial oversight.

115. Only immediate injunctive relief can prevent the continued and irreversible dissemination of this data and the ongoing risk that it will be used for stalking, harassment, or homicide. Every additional day of operation compounds the irreparable injury.

## The Founders Rejected Trading Liberty for Security

116. Defendants' core justification for violating the Bill of Rights is that widespread automated surveillance is necessary for "public safety" and crime reduction. That is just a modern iteration of an ancient pretext for authoritarian control. The American constitutional tradition explicitly rejects the premise that the government may systematically violate protected liberties to achieve administrative or policing efficiency.

117. **Benjamin Franklin on Free Speech:** "Whoever would overthrow the liberty of a nation must begin by subduing the freeness of speech."

118. **Thomas Jefferson on Choosing Freedom Over Comfort:** "Timid men… prefer the calm of despotism to the boisterous sea of liberty."

119. **James Madison on Protecting Constitutional Rights** In a 1792 speech, Madison warned that liberty is never truly safe until citizens react to a government breaking a constitutional rule with the same anger they would feel if someone invaded their home. (from his essay "Charters," *National Gazette*, 18 January 1792): "Liberty and order will never be perfectly safe, until a trespass on the constitutional provisions for either, shall be felt with the same keenness that resents an invasion of the dearest rights; until every citizen shall be an Argus to espy, and an Ægeon to avenge, the unhallowed deed."

120. **Thomas Paine on the Danger of Bad Precedents:** "He that would make his own liberty secure, must guard even his enemy from oppression; for if he violates this duty, he establishes a precedent that will reach to himself."

121. **John Adams on the Fragility of Freedom:** "But a Constitution of Government once changed from Freedom, can never be restored. Liberty once lost is lost forever."

122. **Professor Viet Trinh** (Yale, Ohio State) spoke before the Ohio legislature and stated:

> "My name is Dr. Viet Trinh. I'm a professor at Ohio State University. At the Ohio State University, my areas of expertise include crime, surveillance, and policing. I've been doing this research for 14 years now. First at the University of California, and then at Yale, and now in Columbus.
>
> It is my professional opinion that Flock is a dystopian violation of our rights. And what I mean by that is that it inverts the very nature of how police are supposed to function.
>
> So in traditional investigations, a crime is supposed to happen first, and then detectives are supposed to identify a list of plausible suspects, and then those suspects are placed under investigation. But under Flock, we are all — everybody in this room, every day, every time we get into our cars — we are all under investigation at all times for all crimes.
>
> Then when a crime actually does occur, the police have a list of pre-investigated suspects. That's you, that's me, that's everybody in this room who gets in a car, that's everybody in this city.
>
> So today in Columbus, our constitutional rights, especially our Fourth Amendment rights, are flagrantly violated every single day as a matter of regular government policy.
>
> Let me phrase this another way.
>
> Today I've heard a lot in these chambers about investigating crimes. I've heard that a lot. "Flock lets us investigate crimes. Flock lets us prevent crimes."
>
> But it's my position that this is actually a misnomer. Despite what others have said here, Flock does not investigate crimes at all. It is not a tool for investigating crimes.
>
> And that misnomer has apparently bamboozled several people in this room.
>
> Flock is, at its very foundation, a tool for investigating pre-crimes. Not crimes, but pre-crimes.
>
> Others in this room have implied that we can reform Flock. We can have Flock and preserve our civil liberties. We can make this technology work for us. We just need to install more safeguards. We

> just need to install more protections. We just need guardrails that will prevent abusers from stalking their ex-girlfriends.
>
> Yet the very nature of this technology — that is, the technology as a tool for investigating pre-crime — categorically precludes that. This is not a technology that can be reformed or regulated or managed. It is not a technology that can be made righteous.
>
> On this matter, we cannot and we can never have our cake and eat it too.
> To believe otherwise is hubris. And to be frank, I have seen a baffling amount of hubris in these chambers today."

## BALANCE OF THE EQUITIES AND PUBLIC INTEREST

123. The balance of the equities tips decisively in favor of stopping the Flock network.

124. Enjoining the continued operation of the cameras and the export of data into Flock's national platform vindicates the Fourth Amendment's prohibition on unreasonable searches, the Driver's Privacy Protection Act, and the public's right of access to government records under Florida law. These are foundational constitutional and statutory protections.

125. The only interest the City can assert in opposition is the claim that Flock cameras reduce crime. That argument is non sequitur and a lie. The City has produced no competent evidence that its 49-camera network has caused any measurable reduction in crime.

126. Assuming, arguendo, that the cameras produce some incremental crime-reduction benefit, the Constitution does not permit the government to purchase public safety by systematically violating the Fourth Amendment rights of its residents. Crime reduction, however desirable, cannot justify a warrantless, city-wide, biometric surveillance dragnet whose data is shared worldwide.

127. To make this point more clear, all crime could be stopped if people were imprisoned inside of concentration camps. The United States of America does not allow

that, while China, North Korea, etc. do. Flock surveillance is just an open-air way to imprison.

**The Atlanta Flock Experiment**

128. The Atlanta experiment is evidence. Despite Flock's repeated marketing claims that its cameras increase clearance rates, including the assertion that one additional camera per sworn officer correlates with a 9.1 percent improvement, empirical data from Atlanta, Flock's headquarters and flagship city, directly refute those assertions. The Connect Atlanta surveillance network, which relies heavily on Flock technology, expanded from approximately 3,300 cameras in 2021 to more than 28,000 by 2026.

129. Yet Atlanta Police Department clearance rates stagnated or declined over the same period: the overall clearance rate (i.e., cases cleared or solved) fell from 53.4 percent in 2021 to 48.0 percent in 2025, motor-vehicle-theft clearance rates collapsed from 9.9 percent to as low as 3.9 percent before a partial recovery, and human-trafficking clearances remained abysmal.

130. Flock's own "Impact Census" figure, that an estimated 20 percent of solved cases were "assisted" by its technology, is a statistical shell game. It measures only Flock's involvement in cases that were already solved, not any increase in the total number of crimes cleared.

131. In the single most heavily surveilled major city in the United States, Atlanta, using Flock's own product, the data show no meaningful improvement in solving the very categories of crime Flock claims to address most effectively.

132. Therefore, the public interest strongly favors an injunction. The public has a profound interest in preventing the permanent, uncontrolled dissemination of its location data, facial images (including those of children), and patterns of life. An injunction that halts

this system pending full adjudication of its constitutionality serves that interest and upholds the rule of law.

## CONCLUSION

133. This Complaint has established the following facts:

A) **The claim that Flock reduces crime is false**: Even in Atlanta, Flock's flagship city, massive camera expansion produced no meaningful improvement in clearance rates.

B) **Flock is not a mere license-plate reader:** It creates detailed "Vehicle Fingerprints" and enables officers to reconstruct weeks of a person's movements without a warrant.

C) **The system deliberately tracks pedestrians** through cameras aimed at parks, sidewalks, and store entrances, and its software performs facial and body recognition.

D) **Local data goes into the ether:** Port St. Lucie's contract grants Flock a perpetual worldwide license, so local residents' data becomes freely searchable by agencies across the country, indeed across the globe, with no judicial oversight.

E) **Once the data is uploaded into Flock's national network it cannot be recalled**, enabling irreversible harm including lethal violence by armed officers and a permanent chilling effect on constitutional rights.

F) **There are no meaningful safeguards**: any officer can access the system after a short orientation and the software accepts even facetious justifications.

G) **Police officers across the country have been arrested** or fired for using Flock to stalk ex-partners, track private citizens, and conduct hundreds of unauthorized personal queries.

H) **Cameras have been deliberately pointed at gun-range entrances**, creating a searchable record of lawful gun owners and chilling Second Amendment activity.

I) **The City of Port St. Lucie actively obstructs transparency** by demanding an unlawful $1,000 fee and asserting baseless exemptions to hide camera locations and audit logs.

J) **Local governments across the country are already canceling Flock** contracts over privacy and data-sharing concerns.

134. Those facts establish a pattern of illegality by Flock and its partners that violates the U.S. and Florida Constitutions, as well as other laws.

135. Flock Safety's ALPR network is egregiously and obviously violating both Florida and federal law. It conducts warrantless, continuous, city-wide tracking of vehicles and pedestrians, converts every movement into searchable biometric and location data, exports that data under a perpetual worldwide license, and places unrestricted querying power in the hands of individual officers. That is exactly the kind of "too permeating police surveillance" the Fourth Amendment, the Florida Constitution's privacy and search provisions, and the Driver's Privacy Protection Act were written to forbid.

136. If that illegality is so clear, then how did the system spread so rapidly across the country? The answer is that this is the standard Silicon Valley business model: Take an untested, unproven technology and rush it into deployment at scale, then lock in contracts and data pipelines before courts, legislatures, or the public can catch up. City governments are far too eager to accept some form of quid pro quo for allowing it.

137. The same pattern is visible today with driverless taxis being pushed into major cities while safety data remains incomplete. Flock followed the identical playbook, aggressively marketing "public safety" cameras, securing multi-year municipal contracts, and building a national data-sharing platform while the legal and practical risks were still theoretical.

138. Flock is also part of the rogue unaccountable government known as the 'deep state'. It is quite likely that "national security" was used to sway municipalities.

139. Now that Flock has been operating for several years, the real-world consequences are no longer theoretical. Police officers have been arrested for using the system to stalk ex-partners, track private citizens with no open investigation, and run hundreds of unauthorized personal queries.

140. The same pattern has already appeared inside Port St. Lucie itself. The pendulum has therefore swung back. What was once sold as an unstoppable public-safety tool is now facing regulation, contract cancellations, cameras placed under black bags, and lawsuits. The illegal spread of Flock is being curtailed all over the country now.

## COUNT 1 – VIOLATION OF THE FOURTH AMENDMENT

(Warrantless Search via Flock ALPR Network – 42 U.S.C. § 1983)

**Statute of Limitations:**

141. The statute of limitations for a § 1983 claim arising in Florida is four years. *City of Hialeah v. Rojas*, 311 F.3d 1096, 1103 (11th Cir. 2002); Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. A person acted under color of state law;
2. That person deprived the plaintiff of a right secured by the Constitution or laws of the United States; and
3. For municipal liability, the deprivation was caused by an official policy, custom, or practice of the municipality (*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

**How the Facts Prove Each Element:**

142. This Count is asserted against Defendants City of Port St. Lucie, Shannon Martin (in her official and individual capacities), and Flock Safety, Inc.

143. Plaintiff realleges and incorporates by reference the factual allegations in paragraphs 7–16, 26–45, and 92–93 as if fully set forth herein.

144. Defendants City of Port St. Lucie and Mayor Shannon Martin acted under color of state law when they authorized, maintained, and operated the Flock ALPR network. Defendant Flock Safety, Inc. acted under color of state law through its joint participation with the City in the design, installation, operation, and national data-sharing of the system.

145. Citizens retain a reasonable expectation of privacy in the whole of their physical movements, whether traveling by vehicle or on foot. Carpenter v. United States, 585 U.S. 296, 310 (2018). Continuous, long-term surveillance that reveals intimate details of a person's habits and patterns, that is dramatically more efficient than traditional human surveillance, and that permits retrospective reconstruction of past movements constitutes a search under the Fourth Amendment. Id. at 312; Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 2 F.4th 330, 341 (4th Cir. 2021) (en banc).

146. The City's Flock network of at least 49 cameras satisfies every Carpenter factor. The system creates searchable "Vehicle Fingerprints" that record not only license plates but also make, model, color, roof racks, bumper stickers, dents, and other unique identifiers. It also captures and analyzes human faces and body characteristics of pedestrians. Officers can reconstruct multi-week travel patterns of both vehicles and people on foot without a warrant or individualized suspicion.

147. The City's decision to deploy and maintain this network without requiring a warrant, probable cause, or meaningful judicial or supervisory oversight constitutes an official municipal policy and custom that is the moving force behind the constitutional violations. *Monell*, 436 U.S. at 694. By repeatedly photographing and biometrically tracking Plaintiff (both in his vehicle and as a pedestrian) and retaining the resulting data in a searchable national database accessible without a warrant, Defendants have deprived Plaintiff of his Fourth Amendment right to be free from unreasonable searches.

## COUNT 2 – VIOLATION OF THE FOURTH AMENDMENT

(Monell Liability for National Data-Export Custom – 42 U.S.C. § 1983)

148. To hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must show that the constitutional violation resulted from an official policy, custom, or practice of the city itself. *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978).

149. Congress did not intend § 1983 to impose *respondeat superior* liability on municipalities for the isolated acts of their thousands of individual employees. If it had, cities would face constant lawsuits for every officer's misconduct. *Respondeat superior* applies to private employers, but not to municipal governments under § 1983.

150. Therefore, the City of Port St. Lucie can be sued only if it adopted or maintained an official policy. Here, because of the multi-year contract and national data-export arrangement with Flock Safety, that was the moving force behind the constitutional injury. There is no reasonable doubt that Flock usage is official city policy.

**Statute of Limitations:**

151. The statute of limitations for claims under 42 U.S.C. § 1983 is not defined by the federal law. Courts use state law and other case law. Here, four years is the statute of limitations per *City of Hialeah v. Rojas*, 311 F.3d 1096, 1103 (11th Cir. 2002); Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. An official policy or custom of the municipality;
2. The policy or custom caused a constitutional deprivation; and
3. The deprivation was of a right secured by the Constitution or laws of the United States.

**How the Facts Prove Each Element:**

152. The City of Port St. Lucie has an official policy and custom of exporting all ALPR data collected within its borders into Flock Safety's national network under a perpetual, worldwide license. This policy is reflected in the City's multi-year contract with Flock (¶¶ 13, 30) and is confirmed by the system's actual operation: local retention settings are overridden, and Port St. Lucie residents' location data become freely searchable by out-of-state and federal agencies with no local control or judicial oversight (¶¶ 31–32).

153. This national data-export policy is the moving force behind the Fourth Amendment violations. By joining Flock's national architecture, the City deliberately created a system in which the continuous, warrantless tracking of Plaintiff's movements (both vehicle and pedestrian) is not confined to local officers but is made available nationwide (¶¶ 9, 13, 30–32, 92–93). The constitutional injury—the warrantless reconstruction of the whole of Plaintiff's physical movements—would not exist but for the City's decision to export the data beyond its borders.

154. The resulting continuous, long-term surveillance of Plaintiff's movements without a warrant violates the Fourth Amendment under *Carpenter v. United States*, 585 U.S. 296 (2018), and *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021) (en banc).

# COUNT 3 – VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT (18 U.S.C. §§ 2721–2725)

**Statute of Limitations**

155. The Driver's Privacy Protection Act does not contain its own statute of limitations. Courts apply the residual four-year federal statute of limitations in 28 U.S.C. § 1658(a).

**Elements to be Proved**

1. The defendant obtained or disclosed personal information from a motor vehicle record;
2. The disclosure was for a purpose not permitted under 18 U.S.C. § 2721(b); and
3. The plaintiff is the individual to whom the information pertains.

**How the Facts Prove Each Element**

156. Defendants (City of Port St. Lucie, Shannon Martin, and Flock Safety, Inc.) knowingly obtained, disclosed, and used personal information from motor vehicle records. The Flock system captures license-plate numbers and vehicle characteristics, links them to registered owners through motor-vehicle databases, and stores the resulting data in a searchable national platform. The City collects this information through its 49-camera network and contractually grants Flock a perpetual, worldwide license to share the data across its national network (¶¶ 13, 26–30).

157. The obtaining, disclosure, and use of this personal information is not for any purpose permitted under 18 U.S.C. § 2721(b). The system operates continuously, without individualized suspicion, without a warrant, and without limitation to legitimate law-enforcement investigations. Officers may query the database at will, including for personal reasons, and out-of-state agencies freely search Port St. Lucie data with no local oversight (¶¶ 9, 12, 31–32, 37).

158. Plaintiff is an individual to whom the personal information pertains. As a daily driver on the public roads of Port St. Lucie, Plaintiff's license plate, vehicle fingerprint, and associated personal information are repeatedly captured, stored, and made available for warrantless search by the Defendants' system (¶¶ 92–93).

## COUNT 4 – VIOLATION OF THE SECOND AMENDMENT

(Chilling Effect on the Right to Keep and Bear Arms – 42 U.S.C. § 1983)

**Statute of Limitations:**

159. The statute of limitations for a § 1983 claim arising in Florida is four years. *City of Hialeah v. Rojas*, 311 F.3d 1096, 1103 (11th Cir. 2002); Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. A person acted under color of state law;
2. That person deprived the plaintiff of a right secured by the Constitution or laws of the United States (here, the Second Amendment); and
3. For municipal liability, the deprivation was caused by an official policy, custom, or practice of the municipality (*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

**How the Facts Prove Each Element:**

160. Defendants City of Port St. Lucie, Shannon Martin (in her official and individual capacities), and Flock Safety, Inc. acted under color of state law. The City operates and controls the Port St. Lucie Police Department and maintains a multi-year contract with Flock Safety for its network of at least 49 ALPR cameras (¶¶ 23, 27, 30). Mayor Shannon Martin acted under color of state law at all relevant times (¶ 24). Flock Safety, Inc. acted under color of state law through its joint participation with the City in the surveillance program and the contractual arrangement that makes the City's data available on Flock's national platform (¶ 25).

161. Defendants deprived Plaintiff of a right secured by the Second Amendment. Flock cameras have been deliberately positioned to monitor the entrances and parking areas of gun ranges, capturing the license plates and vehicle fingerprints of individuals exercising their Second Amendment rights and creating a searchable record of lawful gun owners and range visitors without any individualized suspicion or warrant (¶¶ 46–48). In St. Lucie County (the same county where Plaintiff resides and the City operates its Flock network) more than 40 Flock cameras form a dragnet covering every major shooting range and gun club in the area (¶¶ 49–50). Because the cameras are positioned on the main roads leading to these facilities (and in many cases within a short distance of the entrances), it is practically impossible for a gun owner to visit any of them without being recorded if law enforcement chooses to track travel to gun ranges (¶ 51). Plaintiff regularly drives the public streets of Port St. Lucie and is subject to this continuous tracking (¶¶ 92–93). The resulting surveillance of visits to gun ranges chills the exercise of the right to keep and bear arms.

162. The deprivation was caused by an official policy, custom, or practice of the municipality. The City's decision to deploy and maintain the 49-camera Flock network—including its coverage of roads leading to gun ranges—and to grant Flock a perpetual, worldwide license to share the data constitutes an official municipal policy and custom that is the moving force behind the Second Amendment violation (¶¶ 13, 27, 30, 46–51). Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

# COUNT 5 – VIOLATION OF THE FLORIDA PUBLIC RECORDS ACT (Fla. Stat. §§ 119.01, 119.07)

**Statute of Limitations:**

163. Four years for actions founded on a statutory liability. Fla. Stat. § 95.11(3)(f).

**Element to be Proved:**

1. The requested materials are public records;
2. The agency refused to permit inspection or copying, or imposed an unlawful condition on access; and
3. Any special service charge was not based on the actual cost of extensive use of information technology resources or clerical assistance as required by Fla. Stat. § 119.07(4).

**How the Facts Prove Each Element:**

164. The requested materials are public records. Camera locations, installation details, active system IDs, and audit logs of the City's Flock ALPR network are "public records" under Fla. Stat. § 119.011 because they are documents, papers, or other materials made or received pursuant to law or in connection with the transaction of official business by the City of Port St. Lucie (¶¶ 94, 96).

165. The agency refused to permit inspection or copying, or imposed an unlawful condition on access. In June 2026, a written public-records request under Fla. Stat. § 119.07(1) sought the locations of all Flock cameras and the system's audit logs; the City refused to produce the records unless a $1,000 "special service charge" was paid (¶¶ 94–95). On August 3, 2026, another request sought "an active camera inventory and locations" and "a complete list of the flock cameras locations installation details and active system ids"; on August 10, 2026, the City formally denied the request in its entirety, claiming an exemption under Fla. Stat. § 119.071(2)(d) (¶ 96). The asserted exemption is baseless:

camera locations on public roadways are not confidential surveillance techniques, and the statute does not authorize a blanket refusal to disclose the physical placement of fixed ALPR cameras (¶ 97).

166. Any special service charge was not based on the actual cost of extensive use of information technology resources or clerical assistance as required by Fla. Stat. § 119.07(4). The $1,000 fee far exceeds any actual cost of duplication or extensive use of information-technology resources authorized by § 119.07(4)(d) and functions as an unlawful barrier to transparency and a constructive denial of access (¶ 95).

## COUNT 6 – VIOLATION OF ARTICLE I, SECTION 12 OF THE FLORIDA CONSTITUTION

(Warrantless Search via Automated Surveillance Network)

**Statute of Limitations:**

167. Four years for actions founded on a statutory or constitutional liability. Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. The defendant, acting under color of state law, conducted a search of the plaintiff.
2. The search was unreasonable.
3. The deprivation was caused by an official policy, custom, or practice of the municipality (for municipal liability).

**How the Facts Prove Each Element:**

168. This Count is asserted against Defendants City of Port St. Lucie, Shannon Martin (in her official and individual capacities), and Flock Safety, Inc.

169. Plaintiff realleges and incorporates by reference only the factual allegations in ¶¶ 7–16, 26–32, 38–45, and 92–93 as if fully set forth herein.

170. Article I, Section 12 of the Florida Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures."

171. Under both federal and Florida law, the government conducts a constitutional "search" when it systematically collects and aggregates an individual's long-term physical location and movements over public thoroughfares. Citizens do not surrender their expectation of privacy merely because they travel in public. The Florida Supreme Court recognized this principle in *Tracey v. State*, 152 So. 3d 504 (Fla. 2014), holding that an individual maintains a subjective and reasonable expectation of privacy in real-time location information while traveling on public roads.

172. Defendants City of Port St. Lucie and Mayor Shannon Martin acted under color of state law when they authorized, contracted for, and operated the Flock network. Defendant Flock Safety, Inc. acted under color of state law through its joint participation in the design, operation, and national data-sharing architecture of the system.

173. The City of Port St. Lucie maintains a network of at least 49 Flock Safety AI-enabled ALPR cameras that photograph every vehicle, extract license-plate data and vehicle characteristics, and upload searchable "Vehicle Fingerprints" (including make, model, color, roof racks, bumper stickers, dents, and other unique identifiers) to a centralized cloud database (¶¶ 7–9, 26–30). The system also captures and analyzes human faces and body characteristics of pedestrians (¶¶ 29, 38–41).

174. Data is retained for at least 30 days (longer if downloaded) and is contractually shared across Flock's national network under a perpetual, worldwide license, allowing any authorized officer (local or out-of-state) to query the database at will and

reconstruct multi-week travel patterns without a warrant, probable cause, or meaningful supervisory review (¶¶ 9, 13, 30–32).

175. Plaintiff regularly drives the public streets of Port St. Lucie. Given the density and placement of the 49 cameras, it is functionally impossible for him to travel any meaningful distance without being photographed multiple times. The system has therefore catalogued his movements over multi-week periods, enabling reconstruction of his patterns of life without a warrant or individualized suspicion (¶¶ 92–93).

176. This continuous, warrantless, long-term tracking of Plaintiff's physical movements (both by vehicle and on foot) constitutes an unreasonable search under Article I, Section 12 of the Florida Constitution, which must be construed in conformity with the Fourth Amendment as interpreted in Carpenter v. United States, 585 U.S. 296 (2018), and Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 2 F.4th 330 (4th Cir. 2021) (en banc).

177. The deprivation was caused by the City's official policy and custom of deploying and maintaining the warrantless Flock network and of exporting the resulting data into Flock's national platform (¶¶ 13, 27, 30). As a direct and proximate result, Plaintiff has suffered a deprivation of his constitutional right to be secure against unreasonable searches.

# COUNT 7 – VIOLATION OF ARTICLE I, SECTION 23 OF THE FLORIDA CONSTITUTION

(Unlawful Government Intrusion into the Right of Privacy)

**Statute of Limitations:**

178. Four years for actions founded on a statutory or constitutional liability. Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. The plaintiff has a legitimate expectation of privacy in the information at issue.
2. The government intruded into the plaintiff's private life.
3. The intrusion fails strict scrutiny (no compelling state interest advanced by the least intrusive means).
4. The deprivation was caused by an official policy, custom, or practice of the municipality (for municipal liability).

**How the Facts Prove Each Element:**

179. This Count is asserted against Defendants City of Port St. Lucie, Shannon Martin (in her official and individual capacities), and Flock Safety, Inc.

180. Plaintiff realleges and incorporates by reference only the factual allegations in ¶¶ 7–16, 26–32, 38–51, and 92–93 as if fully set forth herein.

181. Article I, Section 23 of the Florida Constitution states that "[e]very natural person has the right to be let alone and free from government intrusion into the person's private life."

182. The Florida Supreme Court has repeatedly affirmed that the express right of privacy protected by Article I, Section 23 is a standalone, fundamental right that is "broader, more fundamental, and more highly guarded than any federal counterpart." Weaver v. Myers, 229 So. 3d 1118, 1125 (Fla. 2017).

183. Among the core aspects of a person's "private life" protected from unlawful municipal oversight is the entirety of that person's physical movements, associations, and daily routines, whether traveling by motor vehicle or on foot.

184. Once a plaintiff demonstrates a legitimate expectation of privacy in the intercepted information, the burden of proof shifts entirely to the government to show that: (a) there is a "compelling state interest" warranting the severe intrusion into the individual's privacy; and (b) the purported compelling interest is satisfied "through use of the least intrusive means." *Winfield v. Division of Pari-Mutuel Wagering*, 477 So. 2d 544, 547 (Fla. 1985).

185. Defendants City of Port St. Lucie and Mayor Shannon Martin acted under color of state law when they authorized, contracted for, and operated the Flock network. Defendant Flock Safety, Inc. acted under color of state law through its joint participation in the design, operation, and national data-sharing architecture of the system.

186. The City of Port St. Lucie maintains a network of at least 49 Flock Safety AI-enabled cameras that continuously photograph every vehicle, create searchable "Vehicle Fingerprints," capture and analyze human faces and body characteristics of pedestrians, and upload the resulting data to a centralized cloud database retained for at least 30 days (longer if downloaded) (¶¶ 7–9, 26–30, 38–41). The City's contract grants Flock a perpetual, worldwide license to share this data across its national network (¶¶ 9, 13, 30).

187. Plaintiff regularly drives the public streets of Port St. Lucie. Given the density and placement of the cameras, it is functionally impossible for him to travel any meaningful distance without being photographed multiple times. The system has catalogued his movements over multi-week periods, enabling reconstruction of his patterns of life—including visits to medical providers, places of worship, political gatherings, and other

private destinations—without a warrant or individualized suspicion (¶¶ 92–93). The same network also tracks pedestrians and is positioned to monitor gun-range traffic (¶¶ 38–41, 46–51).

188. This pervasive, warrantless collection and aggregation of Plaintiff's physical movements, associations, and daily routines constitutes a severe intrusion into his private life under Article I, Section 23. Defendants cannot satisfy strict scrutiny. A general law-enforcement interest in reducing crime does not justify a city-wide biometric and vehicular dragnet targeting innocent residents, and the system is not the least intrusive means available.

189. Defendants further compound the violation by contractually exporting Plaintiff's private location, vehicle, and pedestrian data into a nationally shared commercial network, stripping the information of local retention protections and exposing his private life to out-of-state agencies and entities without judicial oversight (¶¶ 9, 13, 30).

190. The deprivation was caused by the City's official policy and custom of deploying and maintaining the Flock network and of exporting the resulting data into Flock's national platform. As a direct and proximate result, Plaintiff has suffered a deprivation of his fundamental right to be let alone under Article I, Section 23 of the Florida Constitution.

# COUNT 8 – VIOLATION OF ARTICLE I, SECTION 9 OF THE FLORIDA CONSTITUTION

(Deprivation of Due Process via Automated Shifting of Suspicion)

**Statute of Limitations:**

191. Four years for actions founded on a statutory or constitutional liability. Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. The defendant, acting under color of state law, deprived the plaintiff of life, liberty, or property.

2. The deprivation occurred without due process of law.

3. The deprivation was caused by an official policy, custom, or practice of the municipality (for municipal liability).

**How the Facts Prove Each Element:**

192. This Count is asserted against Defendants City of Port St. Lucie, Shannon Martin (in her official and individual capacities), and Flock Safety, Inc.

193. Plaintiff realleges and incorporates by reference only the factual allegations in ¶¶ 7–16, 26–32, 37, 71–86, 88–91, and 92–93 as if fully set forth herein. Those paragraphs specifically describe the City's 49-camera Flock network, the absence of any warrant or individualized-suspicion requirement before historical queries, the acceptance of facetious justifications such as "hehehe," the lack of meaningful supervisory audits, the documented local misuse by Lieutenant Aaron Martin (husband of Defendant Mayor Shannon Martin) to track a political opponent on foot and leak the resulting footage, and the broader pattern of officers nationwide using the same system for personal tracking without internal detection.

194. Article I, Section 9 of the Florida Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

195. Fundamental due process under the Florida Constitution requires the government to maintain the presumption of innocence and prohibits the state from arbitrarily shifting the burden onto a citizen or subjecting the citizen to perpetual, automated investigative scrutiny without localized, individualized suspicion.

196. Defendants City of Port St. Lucie and Mayor Shannon Martin acted under color of state law when they authorized, contracted for, and operated the Flock network. Defendant Flock Safety, Inc. acted under color of state law through its joint participation in the design, operation, and national data-sharing architecture of the system.

197. By integrating the City's 49 cameras into a nationwide private platform that any officer can query after a short orientation, with no probable-cause or warrant requirement and with only superficial "search reason" prompts, Defendants created a system that treats every resident, including Plaintiff, as a subject of persistent suspicion simply because the resident's movements are automatically logged and stored in a searchable database. Officers are permitted to "investigate first and justify later."

198. The absence of mandatory supervisory review, regular audits, or judicial pre-approval before historical tracking queries strips Plaintiff of the procedural safeguards that due process requires. The result is a system of unchecked, quasi-criminal tracking that offends the guarantees of Article I, Section 9.

199. The City's decision to deploy and maintain this network without requiring individualized suspicion or judicial oversight constitutes an official municipal policy and custom that is the moving force behind the due-process violation.

200. As a direct result of this policy and the operation of the Flock network, Plaintiff has been deprived of procedural due process and the constitutional protections guaranteed by Article I, Section 9 of the Florida Constitution.

## COUNT 9 – ILLEGAL EXPENDITURE OF PUBLIC FUNDS IN VIOLATION OF THE FLORIDA CONSTITUTION

(Taxpayer Standing Claim)

**Statute of Limitations:**

201. Four years for actions founded on a statutory or constitutional liability. Fla. Stat. § 95.11(3).

**Elements to be Proved:**

1. Plaintiff is a taxpayer of the City of Port St. Lucie who pays municipal taxes that fund City operations.
2. The City is expending (and continues to expend) public tax revenues on a program, contract, and technology infrastructure that operates in direct violation of the United States Constitution and the Florida Constitution.
3. Such expenditure is unauthorized by law, ultra vires, and unconstitutional.
4. Plaintiff has taxpayer standing to seek injunctive relief restraining further illegal expenditures.

**How the Facts Prove Each Element:**

202. This Count is asserted against Defendants City of Port St. Lucie and Shannon Martin (in her official capacity as Mayor). Defendant Flock Safety, Inc. is named because it is the private contractor receiving the public funds and operating the unconstitutional system under color of state law through its joint participation with the City.

203. Plaintiff realleges and incorporates by reference only the factual allegations in ¶¶ 13, 27, 30, 36, 71–86, 92–93, 94–97, 106–115 as if fully set forth herein. Those paragraphs specifically describe the City's multi-year contract (running through at least November 2028) for a 49-camera Flock ALPR network, the contractual perpetual worldwide license that exports Port St. Lucie data into Flock's national platform, the absence of any warrant or individualized-suspicion requirement, the documented local misuse by Lieutenant Aaron Martin (husband of Defendant Mayor Shannon Martin), the obstruction of public-records requests concerning costs and camera locations, and the resulting

violations of the Fourth Amendment, the Driver's Privacy Protection Act, the Second Amendment, and Article I, Sections 9, 12, and 23 of the Florida Constitution.

204. Plaintiff is a resident, citizen, and motor-vehicle owner in the City of Port St. Lucie who regularly drives its public streets and pays sales, property, and municipal taxes that fund City operations, including the Flock contract (¶¶ 19, 36, 92). Plaintiff therefore has taxpayer standing to challenge illegal municipal expenditures. See Dep't of Admin. v. Horne, 269 So. 2d 659, 663 (Fla. 1972) (taxpayers may challenge unconstitutional exercises of spending power); N. Broward Hosp. Dist. v. Fornes, 476 So. 2d 154, 155 (Fla. 1985) (constitutional challenge to expenditure confers standing without additional special injury).

205. Defendants City of Port St. Lucie and Mayor Shannon Martin, acting under color of state law, have allocated and continue to allocate public municipal funds to maintain, service, and operate the 49 AI-enabled Flock cameras and to fund the contractual data-sharing apparatus with Flock Safety, Inc. Publicly available comparable contracts from the St. Lucie County Sheriff's Office (the county in which the City is located) show annual costs of approximately $113,000 for a similar 44-camera network plus platform fees; earlier contracts priced Falcon units at $2,500 per camera per year (¶ 36). The City's own 49-camera deployment and perpetual data-export license represent a comparable and ongoing commitment of taxpayer dollars.

206. Because the operational framework of this tracking network conducts warrantless, continuous, city-wide tracking of vehicles and pedestrians, converts every movement into searchable biometric and location data, exports that data under a perpetual worldwide license, and places unrestricted querying power in the hands of individual officers, it violates the Fourth Amendment (Carpenter v. United States, 585 U.S. 296 (2018); Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 2 F.4th 330 (4th Cir. 2021) (en

banc)), the Driver's Privacy Protection Act, the Second Amendment, and Article I, Sections 9, 12, and 23 of the Florida Constitution (¶¶ 106–115, 123–132). Municipalities are strictly prohibited from expending public tax revenues on programs that operate in direct violation of the state or federal constitutions. The expenditure is therefore unauthorized by law, ultra vires, and unconstitutional.

207. The City's official policy and custom of entering into and maintaining the Flock contract (despite the constitutional defects described above) is the moving force behind the illegal expenditure. As a direct and proximate result, Plaintiff, as a taxpayer, has been and continues to be injured by the diversion of public funds to an unlawful surveillance program that cannot be undone once the data is exported into Flock's national network (¶¶ 71–86).

208. Plaintiff is entitled to an injunction restraining Defendants from further allocating or disbursing municipal tax revenues toward the maintenance, leasing, operation, or data-export features of the unconstitutional camera network.

# PRAYER FOR RELIEF

209. WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the City's Flock ALPR program, national data-export custom, and warrantless surveillance dragnet violate the Second Amendment and the Fourth Amendment to the United States Constitution, the Driver's Privacy Protection Act, and Article I, Sections 9, 12, and 23 of the Florida Constitution;

B. Permanently enjoin the City from operating the ALPR network or contractually exporting data into the national Flock platform without a judicial warrant supported by probable cause;

C. Order the City to produce the requested public records immediately and without the unlawful $1,000 fee;

D. Award liquidated and statutory damages under the DPPA;

E. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and Fla. Stat. § 119.12; and

F. Grant such other and further relief as the Court deems just and proper.

G. Refer this matter to the United States Attorney for the Southern District of Florida for consideration of whether the City's Flock ALPR program, data-export practices, and related conduct constitute a pattern or practice of constitutional violations that may warrant investigation or enforcement action under 34 U.S.C. § 12601 or other applicable civil-rights statutes, and invite the United States Attorney for the Southern District of Florida to intervene, appear as amicus curiae, or file a statement of interest.

## JURY DEMAND

210. Plaintiff demands a trial by jury on all issues so triable.

DATED: August 25, 2026

Respectfully submitted,



Steven E. Greer, MD
10367 SW Green Turtle LN
Port St. Lucie, FL 34987
(212) 945-7252
steve@greerjournal.com